758 So.2d 618 (2000)
Joe Elton NIXON, Petitioner,
v.
Harry K. SINGLETARY, Respondent.
Joe Elton Nixon, Appellant,
v.
State of Florida, Appellee.
Nos. SC93192, SC92006.
Supreme Court of Florida.
January 27, 2000.
Rehearing Denied June 9, 2000.
*619 Jonathan Lang, New York, New York, for Petitioner/Appellant.
Robert A. Butterworth, Attorney General, and Richard B. Martell, Chief, Capital Appeals, Tallahassee, Florida, for Respondent/Appellee.
PER CURIAM.
Joe Elton Nixon, a prisoner under sentence of death, appeals the trial court's order denying his Florida Rule of Criminal Procedure 3.850 motion for postconviction relief. Nixon also petitions this Court for a writ of habeas corpus. We have jurisdiction pursuant to article V, section 3(b)(1) and (9) of the Florida Constitution. For the reasons explained below, we remand this case to the circuit court to hold an evidentiary hearing on Nixon's ineffective assistance of counsel claim.
Nixon was convicted of first-degree murder, kidnapping, robbery, and arson. He was sentenced to death for the first-degree murder conviction. On appeal, this Court affirmed the convictions and sentences, including the death sentence. See Nixon v. State, 572 So.2d 1336 (Fla.1990).
Nixon filed a rule 3.850 motion, which the trial court denied without an evidentiary hearing. Nixon appeals the trial court's denial of his motion for postconviction relief. He also petitions this Court for a writ of habeas corpus. Nixon raises seven issues relating to the trial court's denial of his rule 3.850 motion.[1] He raises three *620 issues in his petition for a writ of habeas corpus.[2] We find the resolution of one issue to be dispositive in this case: whether Nixon's trial counsel was ineffective during the guilt phase of the trial.
Nixon's trial counsel made the following remarks during his opening statement in the guilt phase:
In this case, there will be no question that Jeannie [sic] Bickner died a horrible, horrible death. Surely she did and that will be shown to you. In fact, that horrible tragedy will be proved to your satisfaction beyond any reasonable doubt.
In this case, there won't be any question, none whatsoever, that my client, Joe Elton Nixon, caused Jeannie [sic] Bickner's death. Likewise, that fact will be proved to your satisfaction beyond any reasonable doubt. This case is about the death of Joe Elton Nixon and whether it should occur within the next few years by electrocution or maybe its natural expiration after a lifetime of confinement.
Nixon, 572 So.2d at 1339. During his closing argument, Nixon's counsel said:
Ladies and gentlemen of the jury, I wish I could stand before you and argue that what happened wasn't caused by Mr. Nixon, but we all know better. For several very obvious and apparent reasons, you have been and will continue to be involved in a very uniquely tragic case. In just a little while Judge Hall will give you some verdict forms that have been prepared. He'll give you some instructions on how to deliberate this case. After you've gotten those forms and you've elected your fore-person and you've done what you must do, you will sign those forms. I know you are not going to take this duty lightly, and I know what you will decide will be unanimous. I think that what you will decide is that the State of Florida, Mr. Hankinson and Mr. Guarisco, through them, has proved its case against Joe Elton Nixon. I think you will find that the State has proved beyond a reasonable doubt each and every element of the crimes charged, first-degree premeditated murder, kidnapping, robbery, and arson.
Id. Nixon argues that these comments were the equivalent of a guilty plea by his attorney. He claims that he did not give his attorney consent to enter a guilty plea or agree to allow his attorney to undertake a trial strategy in which guilt would be admitted.[3] Nixon claims that as a result of these comments, he was denied effective representation.
On direct appeal, this Court addressed this issue and remanded the case to the trial court for an evidentiary hearing to determine whether counsel had received Nixon's consent to use this trial strategy:
Over Nixon's objection, this Court remanded to the trial court for an evidentiary hearing to determine whether Nixon was informed of the strategy to concede guilt and seek leniency. Order of October 27, 1987. After a second order of this Court, dated October 4, 1988, clarifying the procedure to be followed in connection with the evidentiary hearing, the defendant was allowed to *621 present witnesses but the state was not. The state's cross-examination of Mr. Corin, Nixon's trial counsel, was limited to the scope of direct examination by the defense. Because the trial court did not interpret the order of October 4, 1988, as requiring him to make findings or conclusions, none were made. On further remand by order of February 1, 1989, the state was allowed to present witnesses. However, the state's examination of Mr. Corin was extremely limited due to his refusal to testify concerning matters not already addressed during his testimony for the defense absent Nixon's waiver of the attorney-client privilege. Nixon refused to waive the privilege and the state was unable to fully examine Mr. Corin.
Id. at 1339-40. This Court eventually declined to rule on the matter:
We recognize the confusion resulting from our remand for these atypical proceedings and decline to dispose of this claim on the present state of the record which we view as less than complete. Accordingly, we do so without prejudice to raise the issue in a later motion to vacate pursuant to Florida Rule of Criminal Procedure 3.850.
Id. at 1340 (footnote omitted).
We begin our analysis by reiterating that the Sixth Amendment of the United States Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence." U.S. Const. amend VI.[4] The United States Supreme Court has stated that "[o]f all the rights that an accused person has, the right to be represented by counsel is by far the most pervasive for it affects his ability to assert any other rights he may have." United States v. Cronic, 466 U.S. 648, 654, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984) (quoting Walter V. Schaefer, Federalism and State Criminal Procedure, 70 Harv. L.Rev. 1, 8 (1956)).
In addition to the right to effective assistance of counsel, "the Due Process Clause [of the Fourteenth Amendment] protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). The State bears the burden of making this demonstration. See Speiser v. Randall, 357 U.S. 513, 526, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958).
The parties are in disagreement regarding the appropriate standard of review in this case. The State urges this Court to apply Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Under Strickland, in order to establish an ineffective assistance of counsel claim, a defendant must demonstrate (1) deficient performance by counsel and (2) prejudice to the defense. Nixon, on the other hand, argues that counsel's conduct in this case amounted to per se ineffective assistance of counsel, and that United States v. Cronic is the proper test. In Cronic, decided the same day as Strickland, "the Supreme Court created an exception to the Strickland standard for ineffective assistance of counsel and acknowledged that certain circumstances are so egregiously prejudicial that ineffective assistance of counsel will be presumed." Stano v. Dugger, 921 F.2d 1125, 1152 (11th Cir.1991) (en banc). The Supreme Court stated:
Moreover, because we presume that the lawyer is competent to provide the guiding hand that the defendant needs, see Michael v. Louisiana, 350 U.S. 91, 100-101, 76 S.Ct. 158, 100 L.Ed. 83 (1955), the burden rests on the accused to demonstrate a constitutional violation. There are, however, circumstances that *622 are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified.
Most obvious, of course, is the complete denial of counsel. The presumption that counsel's assistance is essential requires us to conclude that a trial is unfair if the accused is denied counsel at a critical stage of his trial. Similarly, if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable. No specific showing of prejudice was required in Davis v. Alaska, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), because the petitioner had been "denied the right of effective cross-examination" which "`would be constitutional error of the first magnitude and no amount of showing of want of prejudice would cure it.'" Id., at 318, 94 S.Ct. 1105 (citing Smith v. Illinois, 390 U.S. 129, 131, 88 S.Ct. 748, 19 L.Ed.2d 956 (1968), and Brookhart v. Janis, 384 U.S. 1, 3, 86 S.Ct. 1245, 16 L.Ed.2d 314 (1966)).
Cronic, 466 U.S. at 658-59, 104 S.Ct. 2039 (emphasis added).
We emphasize that the Strickland standard normally applies to ineffective assistance of counsel claims. Cronic only applies to the narrow spectrum of cases where the defendant was completely denied effective assistance of counsel. See Chadwick v. Green, 740 F.2d 897, 900 (11th Cir.1984).
To determine which test applies, we must first decide whether Nixon's trial counsel "entirely fail[ed] to subject the prosecution's case to meaningful adversarial testing." Cronic, 466 U.S. at 659, 104 S.Ct. 2039. Trial counsel's statements during opening and closing arguments raise a question as to whether Nixon's trial counsel did, in fact, fail to subject the State's case to meaningful adversarial testing. See United States v. Swanson, 943 F.2d 1070, 1074 (9th Cir.1991) ("Mr. Ochoa's statements lessened the Government's burden of persuading the jury that Swanson was the perpetrator of the bank robbery[,] ... tainted the integrity of the trial[,] ... [and] was an abandonment of the defense of his client at a critical stage of the criminal proceedings.");[5]Osborn v. *623 Shillinger, 861 F.2d 612, 625 (10th Cir. 1988) ("[A]n attorney who adopts and acts upon a belief that his client should be convicted `fail[s] to function in any meaningful sense as the Government's adversary.'"). Therefore, if Nixon can establish that he did not consent to counsel's strategy, then we would find counsel to be ineffective per se and Cronic would control. We agree with the reasoning of Wiley v. Sowders, 647 F.2d 642, 650 (6th Cir.1981), where the Sixth Circuit Court of Appeals stated:
Although statements made by attorneys in closing arguments are not evidence, nevertheless, for all practical purposes, counsel's admission of guilt on behalf of his client denied to petitioner his constitutional right to have his guilt or innocence decided by the jury. Petitioner, in pleading not guilty, was entitled to have the issue of his guilt or innocence presented to the jury as an adversarial issue. Counsel's complete concession of petitioner's guilt nullified the adversarial quality of this fundamental issue.
Under Cronic, a defendant need not show prejudice; prejudice is presumed. See 446 U.S. at 658-60, 100 S.Ct. 1932. See also State v. Harbison, 315 N.C. 175, 337 S.E.2d 504, 507 ("[W]hen counsel to the surprise of his client admits his client's guilt, the harm is so likely and so apparent that the issue of prejudice need not be addressed."). On the other hand, if Nixon did consent to trial counsel's strategy, then it could not be said that trial counsel was ineffective, and Nixon would not be entitled to relief on this claim.
We recognize that in certain unique situations, counsel for the defense may make a tactical decision to admit guilt during the guilt phase in an effort to persuade the jury to spare the defendant's life during the penalty phase. Of course, in such cases, the dividing line between a sound defense strategy and ineffective assistance of counsel is whether or not the client has given his or her consent to such a strategy. See Francis v. Spraggins, 720 F.2d 1190 (11th Cir.1983); Wiley v. Sowders, 647 F.2d 642 (6th Cir.1981); Jones v. State, 110 Nev. 730, 877 P.2d 1052 (1994); State v. Anaya, 134 N.H. 346, 592 A.2d 1142 (1991); State v. Harbison, 315 N.C. 175, 337 S.E.2d 504 (1995).
Although an attorney has the right to make tactical decisions regarding trial strategy, see Faretta v. California, 422 U.S. 806, 820, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), the determination to plead guilty or not guilty is a matter left completely to the defendant. See Jones v. Barnes, 463 U.S. 745, 751, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983) ("It is also recognized that the accused has the ultimate authority to make certain fundamental decisions regarding the case, as to whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal...."); Brookhart v. Janis, 384 U.S. 1, 86 S.Ct. 1245, 16 L.Ed.2d 314 (1966)(stating that although an attorney can make tactical decisions as to how to run a trial, the Due Process Clause does not permit an attorney to admit facts that amount to a guilty plea without the client's consent). At his arraignment, Nixon entered a "not guilty" plea. By pleading "not guilty," Nixon exercised his right to make a statement in open court that he intended to hold the State to strict proof beyond a reasonable doubt as to the offenses charged. See Byrd v. United States, 342 F.2d 939, 941 (D.C.Cir.1965); Licata v. State, 81 Fla. 649, 651, 88 So. 621, 622 (1921). "Unquestionably, the constitutional right of a criminal *624 defendant to plead `not guilty,' or perhaps more accurately not to plead guilty, entails the obligation of his attorney to structure the trial of the case around his client's plea." Wiley, 647 F.2d at 650.
Thus, the dispositive issue in this case is whether Nixon gave his consent to his trial counsel to concede guilt during the guilt phase of the trial. Because Nixon previously invoked the attorney-client privilege, the 1990 Court was unable to get the answer to this question. Essentially, the 1990 Court issued an invitation to Nixon to raise this issue again in his 3.850 motion. Implicit within that invitation was that the postconviction circuit court conduct another evidentiary hearing, without the risk of the attorney-client privilege, to determine whether Nixon consented to the strategy. Despite this, the circuit court in the present postconviction motion refused to grant an evidentiary hearing, and this Court still does not have the answer that it has been seeking for the last eleven years. Therefore, we remand this case for an evidentiary hearing on this issue. Due process demands this result.
In Boykin v. Alabama, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969), the Supreme Court held that a defendant may not enter a guilty plea unless that plea is intelligent and voluntary:
A plea of guilty is more than a confession which admits that the accused did various acts; it is itself a conviction; nothing remains but to give judgment and determine punishment. See Kercheval v. United States, 274 U.S. 220, 223, 47 S.Ct. 582, 71 L.Ed. 1009. Admissibility of a confession must be based on a "reliable determination on the voluntariness issue which satisfies the constitutional rights of the defendant." Jackson v. Denno, 378 U.S. 368, 387, 84 S.Ct. 1774, 12 L.Ed.2d 908. The requirement that the prosecution spread on the record the prerequisites of a valid waiver is no constitutional innovation. In Carnley v. Cochran, 369 U.S. 506, 516, 82 S.Ct. 884, 8 L.Ed.2d 70, we dealt with a problem of waiver of the right to counsel, a Sixth Amendment right. We held: "Presuming waiver from a silent record is impermissible. The record must show, or there must be an allegation and evidence which show, that an accused was offered counsel but intelligently and understandingly rejected the offer. Anything less is not waiver."
We think that the same standard must be applied to determining whether a guilty plea is voluntarily made. For, as we have said, a plea of guilty is more than an admission of conduct; it is a conviction. Ignorance, incomprehension, coercion, terror, inducements, subtle or blatant threats might be a perfect cover-up of unconstitutionality. The question of an effective waiver of a federal constitutional right in a proceeding is of course governed by federal standards. Douglas v. Alabama, 380 U.S. 415, 422, 85 S.Ct. 1074, 13 L.Ed.2d 934.
Id. at 242-43, 89 S.Ct. 1709 (footnote omitted). Consequently, this Court has stated that "[d]ue process requires a court accepting a guilty plea to carefully inquire into the defendant's understanding of the plea, so that the record contains an affirmative showing that the plea was intelligent and voluntary." Koenig v. State, 597 So.2d 256, 258 (Fla.1992). See also Fla. R.Crim. P. 3.172.
Because counsel's comments were the functional equivalent of a guilty plea, we conclude that Nixon's claim must prevail at the evidentiary hearing below if the testimony establishes that there was not an affirmative, explicit acceptance by Nixon of counsel's strategy. Silent acquiescence is not enough. We also make clear that pursuant to Nixon's ineffective assistance of counsel claim, Nixon has waived the attorney-client privilege. See Reed v. State, 640 So.2d 1094, 1097 (Fla. 1994) ("Thus, it is clear that conversations between the defendant and his or her trial lawyer relevant to ineffective assistance of counsel are not protected by the attorney-client *625 privilege."); § 90.502(4)(c), Fla. Stat. (1999).
We recognize that Nixon was very disruptive and uncooperative at trial. In light of this, as well as the overwhelming evidence in this case, it has been suggested that the strategy employed by Nixon's trial counsel represented Nixon's best chance of receiving a life sentence, and, therefore, counsel should not be faulted or deemed ineffective. Indeed, counsel's strategy may have been in Nixon's best interest. Nevertheless, the Supreme Court has made it clear that the defendant, not the attorney, is the captain of the ship. See Jones; Brookhart. Although the attorney can make some tactical decisions, the ultimate choice as to which direction to sail is left up to the defendant. The question is not whether the route taken was correct; rather, the question is whether Nixon approved of the course.
It has also been suggested that absent this strategy, Nixon's counsel had no other options. We disagree. In every criminal case, a defense attorney can, at the very least, hold the State to its burden of proof by clearly articulating to the jury or fact-finder that the State must establish each element of the crime charged and that a conviction can only be based upon proof beyond a reasonable doubt. Without Nixon's consent to do otherwise, this should have been the strategy utilized by defense counsel. If this strategy worked to Nixon's detriment, Nixon himself must bear the responsibility for that decision. Cf. Faretta, 422 U.S. at 834, 95 S.Ct. 2525 ("The defendant, and not his lawyer or the State, will bear the personal consequences of a conviction.... And although he may conduct his own defense ultimately to his own detriment, his choice must be honored out of `that respect for the individual which is the lifeblood of the law.'") (quoting Illinois v. Allen, 397 U.S. 337, 350-51, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970) (Brennan, J., concurring)).
Finally, in order to avoid similar problems in the future, we hold that if a trial judge ever suspects that a similar strategy is being attempted by counsel for the defense, the judge should stop the proceedings and question the defendant on the record as to whether or not he or she consents to counsel's strategy. See Wiley, 647 F.2d at 650 ("In those rare cases where counsel advises his client that the latter's guilt should be admitted, the client's knowing consent to such trial strategy must appear outside the presence of the jury on the trial record in the manner consistent with Boykin."); State v. House, 340 N.C. 187, 456 S.E.2d 292, 297 (1995) ("Further, we take this opportunity to urge both the bar and the trial bench to be diligent in making a full record of a defendant's consent when a Harbison issue arises at trial."). This will ensure that the defendant has in fact intelligently and voluntarily consented to counsel's strategy of conceding guilt.
Accordingly, for the reasons stated in this opinion, we remand this case to the circuit court to hold an evidentiary hearing on the issue of whether Nixon consented to defense counsel's strategy to concede guilt. In light of our disposition of Nixon's 3.850 appeal, we do not address his habeas claims at this time.
It is so ordered.
HARDING, C.J., and SHAW, ANSTEAD and PARIENTE, JJ., concur.
HARDING, C.J., concurs with an opinion, in which ANSTEAD and PARIENTE, JJ., concur.
ANSTEAD, J., specially concurs with an opinion.
WELLS, J., dissents with an opinion.
LEWIS, J., dissents.
HARDING, C.J., concurring.
"We the people of the United States, in Order to form a more perfect Union, establish Justice, insure domestic Tranquility, *626 provide for the common defence, promote the general Welfare, and secure the Blessings of Liberty to ourselves and our Posterity, do ordain and establish this Constitution for the United States of America." U.S. Const. preamble (emphasis added). As exemplified by the Preamble to this nation's Constitution, justice is the very foundation upon which our system of government was built. Inherent within the concept of justice is the fair processing of cases. Black's Law Dictionary provides the following definition of justice:
Proper administration of laws. In jurisprudence, the constant and perpetual disposition of legal matters or disputes to render [all persons their] due.
Black's Law Dictionary 864 (6th ed.1990) (emphasis added). Consequently, the term "due process of law" has developed to mean:
A course of legal proceedings according to those rules and principles which have been established in our systems of jurisprudence for the enforcement and protection of private rights.
Id. at 500.
Prior to this nation's birth, the colonists were subjected to a system of government that denied individual rights and liberties and failed to provide due process. Based on their experience with the English monarchy and its courts, the founders of this country were determined to ensure that a number of individual rights and liberties were specifically provided for within the body of the Constitution. Today these rights include the right to have effective assistance of counsel in criminal matters, the right against self-incrimination, the right to an impartial jury, the right to a fair trial, the right to confront one's accusers, the right to be presumed innocent until proven guilty, and the right that the government prove a criminal matter beyond a reasonable doubt. These rights are available to all citizens, regardless of race, creed, or social status. History has shown that it is only when due process is strictly adhered to that judicial outcomes are credible. It has been said a number of times that it is more important that no innocent man be convicted than a guilty man go free. See In re Winship, 397 U.S. 358, 372, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) (Harlan, J., concurring) ("[I]t is far worse to convict an innocent man than to let a guilty man go free."); Furman v. Georgia, 408 U.S. 238, 367 n. 158, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (Marshall, J., concurring) ("[I]t is better for ten guilty people to be set free than for one innocent man to be unjustly imprisoned.") (quoting William O. Douglas, Foreword to Jerome Frank & Barbara Frank, Not Guilty 11-12 (1957)).
I share and understand the frustration of my colleagues in dissent. This is a difficult case for several reasons, not the least of which is the substantial evidence of the defendant's guilt. I do not question the competence or experience of trial counsel. Neither do I underestimate the frustration counsel must have experienced with such a disruptive and uncooperative client. Nor do I question that the strategy taken by defense counsel was an effective one reasonably calculated to help the defendant avoid the death penalty. Yet, I cannot accept that substantial evidence of guilt, a disruptive client, and an effective trial strategy can preempt the constitutional right of a defendant to the presumption of innocence and the requirement that a guilty plea be knowingly and intelligently entered. A plea of guilty cannot be entered to a judge or a jury without the defendant's consent. It is not a theoretical gloss or a hypothetical exercise to require that a defendant, no matter how gruesome or horrible his crime, how guilty he is, or how good the trial strategy, be accorded those rights. The courts have consistently required a judge to make inquiry and determine that a guilty plea is voluntarily, intelligently, and freely entered. We have developed a detailed rule setting forth specific procedures that courts must follow in making this determination. See Fla. R.Crim. P. 3.172. My research has not *627 revealed a case where the failure to ensure that a defendant's plea of guilty was voluntary and intelligently entered was error subject to a harmless error analysis.
In the absence of certain knowledge of whether Nixon consented to counsel's strategy, the process for determining guilt or innocence was utterly flawed in this case. If Nixon did not consent, then a number of his constitutional rights were violated: he did not have a fair trial, he did not have effective representation, he was not seen as innocent until proven guilty, and the government was not held to its burden of establishing its case beyond a reasonable doubt. Despite his difficult behavior, Nixon was still entitled to his constitutional rights. Without the benefit of these rights, we can place no credence in the jury's verdict of guilt in this case. Any other conclusion would rend the very fabric from which our justice system was woven.
Aside from the merits, this case is troublesome because of the length of time it has taken for this Court to get to this point. The trial in this case occurred in 1985, yet the trial court's ruling on the 3.850 petition was not ripe for our review until the end of 1998. However troubling this may be, the amount of time this case has taken should in no way bear upon our ultimate decision on the merits. No defendant should be denied the relief required simply because of delay.
For these reasons, I concur with the majority opinion.
ANSTEAD and PARIENTE, JJ., concur.
ANSTEAD, J., specially concurring.
I concur in Chief Justice Harding's opinion. The outcome of this case is controlled by the holding of the United States Supreme Court:
[E]ven when no theory of defense is available, if the decision to stand trial has been made, counsel must hold the prosecution to its heavy burden of proof beyond reasonable doubt.
Cronic, 466 U.S. at 656-57 n. 19, 104 S.Ct. 2039 (emphasis supplied). Obviously, a decision to "stand trial" was made here.
As to the issue concerning counsel's decision to, in essence, enter a plea of guilty without Nixon's consent, the dissent reminds us of the adage that "hard cases make bad law." When we decide cases, we must do so in accord with rules of law that apply to all cases, and therein lies one of the principle flaws in the dissenting opinion. That opinion fails to acknowledge, much less discuss, the rule of law concerning the entry of a guilty plea, and counsel's role and responsibility to her client if counsel believes that a guilty plea should be entered. Instead, it simply concludes this was a hopeless case with horrible facts; therefore, counsel should be free to do anything, including pleading the defendant guilty without the consent of the defendant.[6] As to the law, while the dissent apparently concludes that this defendant's case is hopeless, it ignores the cases to come, especially the ones that will arise if we were to adopt a rule of law that says counsel can make the decision as to a plea of guilty without the consent of the client. That is part of the "bad law" that would come from this "hard case" if we accepted the dissenting view.
The dissent also ignores the fact that the postconviction proceedings and enlargement of the record we previously mandated have never occurred. On direct appeal, we refused to deal with the competency *628 of counsel claim because of the inadequacy of the record and with the express provision that it would be more properly resolved in a postconviction proceeding. See Nixon v. State, 572 So.2d 1336, 1340 (Fla.1990). We know this not only because we expressly said so in Nixon, but also because we had the same issue arise in a subsequent case where we cited our holding in Nixon as one requiring an evidentiary hearing in a postconviction action. See Harvey v. Dugger, 656 So.2d 1253, 1256 (Fla.1995). By approving the trial court's decision, we would be concluding that the same record that was declared inadequate by a unanimous court in 1990 has now become adequate to resolve this issue, and we would be overruling the holding of a unanimous court in the 1990 opinion. Further, we would be ignoring our prior explicit mandate in this very case, and ruling now, as a matter of law, that a lawyer is authorized to concede a defendant's guilt regardless of the defendant's views or input.
The record presented to us also reflects a serious issue as to Nixon's competency. Nixon's competency to stand trial first became an issue when he stood trial on an unrelated assault and battery charge five months before his murder trial.[7] At that trial, Nixon's attorney raised the issue of his client's competency. That prompted the judge to request a psychologist, Dr. Carolyn Stimel, to examine Nixon. This examination occurred during the lunch hour of the proceedings and lasted approximately forty-five minutes. The evaluation did not consist of any psychological testing nor was a formal competency evaluation made. Notwithstanding, the assault trial continued.
The next time that Nixon's competency was discussed was during a pretrial conference in the murder case. At this pretrial conference, the state attorney was concerned about Nixon's competency and urged an examination. There is also evidence that months before trial, Dr. Ekwall opined that Nixon's intelligence was "on the low side of normal, but its adequate." Finally, in 1993, Nixon was examined by three different mental health experts, all three of whom opined that Nixon suffers from mental retardation and may have some form of organic brain damage or organic personality disorder. Despite these concerns, however, both parties essentially concede that no competency hearing was ever conducted.
Specifically, Dr. Henry Lee concluded that Nixon suffers mental retardation and shows unmistakable evidence of Organic Personality Disorder. After evaluating Nixon, he found it surprising that no formal competency hearing was conducted in this case, especially given Nixon's bizarre conduct and statements prior to and during trial. He also found that in addition to the record information, the affidavits of several people, including an attorney skilled in defending the mentally ill, attest to Nixon's psychotic behavior. Dr. Denis William Keyes also concluded that Nixon is mentally retarded and suffers from evident brain damage. The psychological tests administered to Nixon place him below the lowest one percent of the population. Finally, Dr. Alec J. Whyte opined that Nixon suffers from mental retardation and an organic personality disorder. He specifically noted that the process of a criminal trial was beyond Nixon's competence to comprehend, and that his behavior during the trial is evidence of his inability to comprehend what was occurring.
All three of these opinions were based in part on Nixon's behavior before and during trial. This behavior included Nixon's refusal to leave his cell during pretrial hearings, the removal of his clothing, and his hiding under the sheets of his bed when summoned by officials. Furthermore, two months before trial, Nixon *629 wrote an incoherent letter to his attorney that appeared to demonstrate a severe mental imbalance.
Based primarily on the above evidence and evaluations of the mental health experts, Nixon alleged in his 3.850 motion that he was not competent to stand trial. Notwithstanding, the trial court summarily denied this claim, finding it procedurally barred. However, the record does not support this conclusion. On the contrary, the record reflects that at the very least, Nixon was entitled to an evidentiary hearing on whether he was competent to stand trial. See Peede v. State, 748 So.2d 253 (Fla.1999); Jones v. State, 478 So.2d 346 (Fla.1985). In fact, the State concedes that because the judge, prosecutor, and defense counsel in this case, as well as some of the experts who evaluated Nixon contemporaneously with the time of trial and who opined that a competency hearing was not necessary, are still available, a nunc pro tunc hearing could be held in this case. See Mason v. State, 489 So.2d 734 (Fla.1986).
WELLS, J., dissenting.
I dissent.
A thorough review of the record and a plain reading of our opinion in Nixon's direct appeal leads me to the inescapable conclusion that Nixon's claim of ineffective assistance of counsel is governed by Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Competent, substantial evidence supports the trial court's summary denial of Nixon's claim.
I begin my analysis with reference to the facts as set forth in this Court's opinion in Nixon v. State, 572 So.2d 1336 (Fla. 1990):
At trial, there was testimony that after church on August 12, 1984, Ms. Bickner went to a local mall to have lunch with friends. She parked her orange M.G. convertible in the mall parking lot. Ms. Bickner was later seen in the parking lot giving a black man jumper cables from the trunk of her car. Witnesses testified that on the afternoon of August 12 they saw the orange M.G. driven by a black male, later identified as Nixon, near the vicinity of the site where the body was found. Ms. Bickner's body was discovered by a couple riding through the woods who reported the incident to the police. The charred body was in a seated position tied around the waist with jumper cables to a pine tree. Her left arm was tied to another pine tree. Wanda Robinson, John Nixon and other witnesses testified that they saw Nixon driving Ms. Bickner's orange M.G. Robinson and John Nixon also testified that Nixon admitted killing a white woman by tying her with jumper cables and burning her. Nixon also showed them two of Ms. Bickner's rings and later said he had pawned the rings. Robinson and John Nixon also testified that on the morning of the fourteenth, Nixon told them that he was going to burn the orange M.G. There was testimony that Nixon attempted to sell the M.G. prior to burning it. A pawn shop receipt signed by Nixon for two of Ms. Bickner's rings was entered into evidence. A laboratory analyst for the Florida Department of Law Enforcement testified that Nixon's palm print was found on the trunk lid of Ms. Bickner's M.G.
After his arrest, in a taped confession which was played to the jury, Nixon admitted murdering Ms. Bickner. He described how he met Ms. Bickner at the mall and asked her to take him to his uncle's house because he was having car trouble. Once on the road, Nixon hit Bickner in the face. When she stopped the car, Nixon put her in the trunk and then drove to a secluded wooded area where he took her from the trunk and tied her to a tree with jumper cables. According to Nixon, the two talked about their lives. Ms. Bickner offered to give Nixon money, to sign her car over to him, begging him not to kill *630 her. Nixon recounted how he burned Ms. Bickner's personal belongings and then threw the top of the convertible into the fire. At some point after placing a paper bag over her head, Nixon threw the smoldering convertible top on Ms. Bickner, setting her on fire. He then left the scene in the M.G.
572 So.2d at 1338.
I next note the following statements from the two able and experienced trial judges who were involved in this case. First, is the statement of Judge Hall made at the close of the proceedings in 1985:
One facet of the case that doubtless will come under examination is the tactics, strategy, analysis employed by defense counsel in this case.
Trial court is uniquely situated in our judicial system. It's the only judicial officer that sees the people that appear, and observes their demeanor, is able to see the impact that the case has upon the jury, observe that impact, and so forth, as the jury hears it. Privy to the evidence and privy to that evidence as it is presented in the courtroom.
Doubtless, there may be those who have reservations about the approach employed by trial counsel for the defense in this case.
It is my view that the tactic employed by trial counsel in this case was an excellent analysis of reality of his case and the preservation of his credibility and the credibility of any mitigating circumstances that could have been placed before the jury and before this Court, as to disposition.
It is my view, in view of the evidence in this case, the jury has found the defendant guilty by the establishment of evidence beyond and to the exclusion of any reasonable doubt. I think that the evidence, preparation of the case, presentation, would have persuaded any jury, not only beyond a reasonable doubt, but beyond all doubt.
For trial counsel to have inferred that Mr. Nixon was not guilty of these offenses would have deprived him of any credibility during the penalty phase, and to some extent, although professionalism would have detracted a little bit from it, under a sentencing hearing before the Court. I think the trial counsel's approach, the maintenance of credibility, his rapport with the jury, were the only realistic steps that could have been taken, in an effort to give some relief to his client.
A less experienced attorney, probably seeking to avoid criticismeither public, private or professionalwould have tried the case differently, and probably would have left no hope at all for Mr. Nixon.
Mr. Corin's approach, his analysis, his assessment, I think was right on the mark. I think that his approach has been conscientious and in diligent best interest to defend his client, Mr. Nixon.
Second, I note the statement of Judge Smith in ruling upon Nixon's Cronic[8] claim in the postconviction proceedings.
Finally, in respect to the trial record and the direct appeal, there are three matters which are crucial to my conclusion that the majority's decision is wrong:
1. Nixon was presumed to be mentally competent to stand trial. There was no determination by the trial court that he was incompetent, and no issue was raised on appeal that the trial court erred in failing to find him incompetent to proceed.
2. Nixon was extremely uncooperative during the trial. He refused to be in court on several occasions. He took off his clothes in his holding cell to thwart the proceedings. The trial judge went to the holding cell to try to get Nixon to attend and cooperate, but Nixon continued to be uncooperative.
3. Even though Nixon was voluntarily absent from much of the trial, Nixon's *631 trial counsel actively engaged in the trial, including conducting an extensive voir dire, objecting to photographs as unduly gruesome, and moving for a mistrial as to a portion of the State's closing in the guilt phase. In the penalty phase, Nixon's trial counsel presented the testimony of eight witnesses, including Nixon's mother and two mental health experts, a psychiatrist, and a psychologist. Nixon's trial counsel introduced substantial documentary evidence, including school, institution, and psychological reports concerning Nixon's life from 1972 to 1985.
What is plainly the reality of what we have here is a gruesome, horrible murder, confessed to by a competent but obstructive defendant who had experienced trial counsel who proceeded on the basis of a strategy which should be recognized as obviously the only rational legal strategy to try to keep a client out of the electric chair. I cannot join the majority in replacing this plain reality with a theoretical gloss that paints what occurred as if it were some hypothetical exercise which spurned constitutional rights. I cannot accept that our courts must ignore that which reasonable, objective analysis demonstrates is patently evident.
The legal issue before us is whether Nixon's claim of ineffective assistance of counsel is governed by the oft-applied test of Strickland or by dicta in Cronic, which suggests that an attorney, in remote instances, may act so detrimentally to his client's case as to result in a breakdown of the adversarial process and will be deemed prejudicial per se. If Strickland applies, rather than Cronic, then correct legal analysis dictates that the trial judge should be affirmed, not reversed, because competent, substantial evidence supports the trial court's legal ruling that Nixon has failed to establish the requisite prejudice.
I first point out that the decision of whether Cronic applies on this record was decided by this Court in 1990, when it entertained Nixon's direct appeal. Had this Court in 1990 concluded that Cronic applied, surely it would have applied it and not wasted these last nine years. The record before this Court now stands the same as the record before it when it first considered Nixon's Cronic claim in 1990. The trial court was correct in concluding that Strickland applied, for why else would the Court have sent the case on to post-conviction proceedings? What the majority actually does is grant a rehearing of the 1990 decision by this Court, and that is wrong.
I also point out that the majority's decision is based on an overly expansive interpretation of Cronic. The majority's decision as to the application of Cronic is based on cases which either do not apply or cases whose reasoning have been justifiably criticized. The majority relies on cases from the Ninth and Tenth Circuits. See United States v. Swanson, 943 F.2d 1070, 1074 (9th Cir.1991), Osborn v. Shillinger, 861 F.2d 612, 625 (10th Cir.1988). The First Circuit has rightfully rejected the expansive interpretation placed on Cronic in Swanson and Osborn. In Scarpa v. DuBois, 38 F.3d 1 (1st Cir.1994), the First Circuit considered a case in which a lawyer argued a defense on behalf of his client which was tantamount to admitting guilt:
As mentioned above, the district court relied primarily on dictum contained in United States v. Cronic, 466 U.S. at 658-60, 104 S.Ct. at 2046-47, for the proposition that, in the circumstances at bar, it could forgo an inquiry into actual prejudice. The Cronic Court stated that in rare instances prejudice might be presumed "without inquiry into counsel's actual performance at trial." Id. at 662, 104 S.Ct. at 2048 (dictum). But, the approach suggested in this statement is in all events the exception, not the rule-and it can be employed only if the record reveals presumptively prejudicial circumstances such as an outright denial of counsel, a denial of the right to effective cross-examination, or a complete *632 failure to subject the prosecution's case to adversarial testing. See id. at 659, 104 S.Ct. at 2047. The Cronic Court itself warned that, in most cases, a showing of actual prejudice remained a necessary element. See id. The Court stated: "there is generally no basis for finding a Sixth Amendment violation unless the accused can show how specific errors of counsel undermined the reliability of the finding of guilt." Id. at 659 n. 26, 104 S.Ct. at 2047 n. 26.
For the most part, courts have been cautious in invoking the exception limned in the Cronic dictum. Cronic-like principles have been applied, for example, in situations in which defense counsel labored under an actual conflict of interest, see Cuyler v. Sullivan, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), or in which no attorney appeared despite a defendant's unwaived right to appointed counsel, see United States v. Mateo, 950 F.2d 44, 48-50 (1st Cir.1991), or in which defendant's lawyer sat in total silence throughout the relevant proceeding, see Tucker v. Day, 969 F.2d 155, 159 (5th Cir.1992) (involving resentencing); Harding v. Davis, 878 F.2d 1341, 1345 (11th Cir.1989) (holding that defense counsel's muteness throughout trial, including his utter silence as the judge directed a verdict against his client, is per se prejudicial), or in which the defense attorney was absent from the courtroom during a critical part of the trial, see Green v. Arn, 809 F.2d 1257, 1259-64 (6th Cir.), cert. granted, vacated and remanded to consider mootness, 484 U.S. 806, 108 S.Ct. 52, 98 L.Ed.2d 17 (1987); Siverson v. O'Leary, 764 F.2d 1208, 1217 (7th Cir.1985), or, pre-Cronic, in which counsel snoozed through much of the proceedings, see Javor v. United States, 724 F.2d 831, 833 (9th Cir.1984).
A few courts have extended the exception's boundaries beyond the circumstances surrounding representation and found that a lawyer's particular errors at trial may cause a breakdown in the adversarial system and thus justify invocation of the Cronic dictum. See Swanson, 943 F.2d at 1074 (holding that knowingly and explicitly conceding reasonable doubt in closing argument is per se prejudicial); Osborn, 861 F.2d at 628-29 (finding per se prejudice when defense counsel intentionally stressed the brutality of his client's crime, admitted that the evidence against his client was overwhelming, and made statements to the press that his client had no evidence to support his claims). We believe that these cases misperceive the rationale underlying the Cronic exception. In our view, the Court's language in Cronic was driven by the recognition that certain types of conduct are in general so antithetic to effective assistance-for example, lawyers who leave the court-room for long stretches of time during trial are unlikely to be stellar advocates in any matter-that a case-by-case analysis simply is not worth the cost of protracted litigation. No matter what the facts of a given case may be, this sort of conduct will almost always result in prejudice. See Cronic, 466 U.S. at 658-59, 104 S.Ct. at 2046-47. But attorney errors particular to the facts of an individual case are qualitatively different. Virtually by definition, such errors "cannot be classified according to likelihood or causing prejudice" or "defined with sufficient precision to inform defense attorneys correctly just what conduct to avoid." Strickland, 466 U.S. at 693, 104 S.Ct. at 2067. Consequently, the Court has declined to accord presumptively prejudicial status to them. See id.

We are not alone in our attempt to harmonize Cronic with Strickland by drawing an easily visible line separating those few cases in which prejudice may be presumed from the mine-run (in which actual prejudice must be shown). When confronted by particular errors on the part of defense counsel, best evaluated in the context of the defendant's trial, *633 other federal courts have refused to march under the Cronic banner, and, instead, notwithstanding the seriousness of the errors, have performed both parts of the requisite Strickland analysis. Thus, in McInerney v. Puckett, 919 F.2d 350 (5th Cir.1990), the defendant claimed that his lawyer's lack of preparedness and failure to raise an insanity defense justified the invocation of the Cronic dictum. See id. at 352-53. In requiring a showing of prejudice, the Fifth Circuit noted that "bad lawyering, regardless of how bad, does not support the [per se] presumption; more is required." Id. at 353; see also United States v. Thompson, 27 F.3d 671, 676 (D.C.Cir.1994) (finding no prejudice per se in defense counsel's failure to inform defendant before guilty plea that, as a career offender, he faced possible life imprisonment); United States v. Baldwin, 987 F.2d 1432, 1437-38 (9th Cir.) (finding no prejudice per se where attorney conceded his client's guilt at pretrial conference and neglected to request jury instruction on overt act requirement for conspiracy charge), cert. denied, 508 U.S. 967, 113 S.Ct. 2948, 124 L.Ed.2d 696 (1993); Woodard v. Collins, 898 F.2d 1027, 1028 (5th Cir.1990) (requiring showing of prejudice where defense counsel advised the accused to plead guilty to a charge that counsel had not investigated); United States v. Reiter, 897 F.2d 639, 644-45 (2d Cir.) (applying full Strickland standard in spite of defendant's claim that counsel's errors were so pervasive as to amount to "no counsel at all"), cert denied, 498 U.S. 990, 111 S.Ct. 533, 112 L.Ed.2d 543 (1990); Green v. Lynaugh, 868 F.2d 176, 177-78 (5th Cir.) (applying full Strickland analysis to attorney's decision to conduct "almost no investigation"), cert. denied, 493 U.S. 831, 110 S.Ct. 102, 107 L.Ed.2d 66 (1989); Henderson v. Thieret, 859 F.2d 492, 499 (7th Cir.1988) (applying second prong of Strickland to attorney's lack of preparation in connection with sentencing), cert. denied, 490 U.S. 1009, 109 S.Ct. 1648, 104 L.Ed.2d 163 (1989); Gardner v. Ponte, 817 F.2d 183, 186-87 (1st Cir.) (refusing to extend Cronic to attorney's failure to object to jury instructions), cert. denied, 484 U.S. 863, 108 S.Ct. 181, 98 L.Ed.2d 134 (1987); State v. Savage, 120 N.J. 594, 577 A.2d 455, 466 (1990) (finding no prejudice per se in a capital case where counsel only met once with defendant). Similarly, in reviewing claims of ineffective assistance of counsel at the appellate leave, courts have declined to apply Cronic to attorney errors that do not amount to the constructive absence of counsel. See, e.g., Hollenback v. United, States, 987 F.2d 1272, 1276 & n. 1 (7th Cir.1993) (finding no per se prejudice in appellate counsel's citation to wrong provision of money-laundering statute); United States v. Birtle, 792 F.2d 846, 847-48 (9th Cir.1986) (finding no per se prejudice when defendant's appellate counsel failed to appear at oral argument or file a reply brief).
These authorities suggest that attorney error, even when egregious, will almost always require analysis under Strickland's prejudice prong. We agree. Thus, we decline to adopt the expanded version of Cronic embraced by the district court. Our reasons are manifold, but four of them are paramount.
38 F.3d at 11-14 (footnotes omitted) (emphasis added).
The Fifth Circuit has also been critical of the Ninth Circuit with regard to that court's interpretation of Cronic. In Childress v. Johnson, 103 F.3d 1221 (5th Cir. 1997), the court held:
While gleaning insight from Swanson's statement of Sixth Amendment principles, we do not necessarily endorse its finding of a constructive denial of counsel. Defense counsel in Swanson failed to call witnesses and conceded in his closing argument that the evidence of his client's guilt was overwhelming. These appear to be trial errors amenable to Strickland analysis. See Scarpa *634 v. DuBois, 38 F.3d 1, 12 (1st Cir.1994) (criticizing Swanson), cert. denied, 513 U.S. 1129, 115 S.Ct. 940, 130 L.Ed.2d 885 (1995).
103 F.3d at 1229 n.12 (emphasis added). In Vines v. United States, 28 F.3d 1123 (11th Cir.1994), the Eleventh Circuit stated:
"Cronic's presumption of prejudice applies to only a very narrow spectrum of cases where the circumstances leading to counsel's ineffectiveness are so egregious that the defendant was in effect denied any meaningful assistance at all." Chadwick v. Green, 740 F.2d 897, 901 (11th Cir.1984).
Id. at 1128 n. 8.
No fair reading of the instant record can lead to the conclusion that Nixon was "denied any meaningful assistance at all." Id. This case must be analyzed in light of Florida's death penalty procedure. Counsel's performance must necessarily consider both the guilt and penalty phases. The trial record demonstrates that counsel made a rational choice, one that a competent, experienced lawyer would be expected to make given the evidence, which was to call no witnesses and emphasize the penalty phase. This was appropriately stated by Judge Hall in 1985, and this Court is wrong to ignore it in 1999.
I also dissent because I believe the majority's opinion, after more than nine years, creates a new standard for this case. The majority opinion states at page 624 (slip opinion): "[W]e conclude that Nixon's claim must prevail at the evidentiary hearing below if the testimony establishes that there was not an affirmative, explicit acceptance by Nixon of counsel's strategy. Silent acquiescence is not enough." Is this to be "established" by a preponderance of the evidence-clear and convincing evidence-or to the exclusion of every reasonable doubt? Is a nod of the head sufficient, or does the majority actually require a Boykin[9] on-the-record acceptance to have been made? It appears to me that the majority is here dictating a new trial, only leaving to the trial judge the actual ordering of it.
This appears to me to dictate a new trial because the record has been clear for the fifteen years since this trial that during the trial Nixon set about not to "explicitly accept" anything. This was part and parcel of his disruptive and noncooperative conduct. If "explicit acceptance" per Boykin is the requirement, this Court should have so stated in 1990. If that had been correctly the issue then, this Court's majority at that time would have reversed for a new trial based on the record, which does not have a Boykin on-the-record "explicit acceptance." However, the then unanimous majority did not do that. The present new majority confuses our procedure when it in actuality rehears and sets aside that decision. I conclude that it is harmful to the processing of capital cases generally when the majority of this Court erodes the distinction between direct appeal and postconviction relief for a particular case, as is being done here.
Finally, I believe this case again exemplifies why this Court must have a much better and more pro-active case management procedure in capital cases. If, as the majority now holds, the record had to contain "specific testimony," there is no justifiable explanation as to why it has taken a decade to determine whether that testimony exists or to require a new trial. Since I have been on this Court, I have repeatedly advocated that this Court actively case-manage these cases following the direct appeal. This case plainly demonstrates the past-due need for this Court to implement procedures for quarterly case management conferences in the trial courts with status reports reviewed each quarter by this Court and direction through the Chief Justice to the Chief Judge of each circuit in respect to cases in which appropriate *635 progress in the adjudication of post-conviction issues is not being made.
NOTES
[1] Nixon argues the following claims relating to the trial court's denial of his 3.850 motion: (1) the circuit court denied him a full and fair hearing on his ineffective assistance of counsel claim; (2) he was denied his rights not to be tried while mentally incompetent; (3) his death sentence must be set aside because his counsel failed to make an effective argument for sparing his life and presented evidence that was harmful to his case during the sentencing phase of the trial; (4) he was denied a competent mental health evaluation in violation of Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985); (5) he is entitled to prove his claims under Johnson v. Mississippi, 486 U.S. 578, 108 S.Ct. 1981, 100 L.Ed.2d 575 (1988), that the two prior convictions used as aggravating circumstances lacked validity; (6) he should have the opportunity to prove that race discrimination tainted his conviction and death sentence; and (7) the jury weighed invalid and unconstitutionally vague aggravating circumstances in violation of James v. State, 615 So.2d 668 (Fla. 1993), and Jackson v. State, 648 So.2d 85 (Fla.1994).
[2] Nixon presents the following claims in his habeas petition: (1) appellate counsel failed to raise on direct appeal any issue regarding Nixon's competency to stand trial; (2) appellate counsel failed to properly preserve Nixon's claims under Ake v. Oklahoma; and (3) appellate counsel failed to properly preserve Nixon's claims under James v. State and Jackson v. State.
[3] Nixon voluntarily absented himself from the courtroom during his trial. Hence, he was not present when his attorney made the statements in question.
[4] "In Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), the Court held that the Sixth Amendment right to counsel was incorporated into the due process clause [of the Fourteenth Amendment] and would apply to the states in all felony prosecutions." Vagner v. Wainwright, 398 So.2d 448, 450 (Fla.1981).
[5] The Swanson court also stated:

The circumstance presented in this matter demonstrates the constructive absence of an attorney dedicated to the protection of his client's rights under our adversarial system of justice. Once Swanson's court appointed attorney told the jury that there was no reasonable doubt regarding his client's identity as the perpetrator of the crime charged against him, he ceased to function as defense counsel. "An effective attorney `must play the role of an active advocate, rather than a mere friend of the court.'" Osborn, 861 F.2d at 624 (quoting Evitts v. Lucey, 469 U.S. 387, 394, 105 S.Ct. 830, 835, 83 L.Ed.2d 821 (1985)). Instead of serving as his client's advocate during closing argument, Mr. Ochoa abandoned his client at a critical stage of the proceedings and affirmatively aided the prosecutor in her efforts to persuade the jury that there was no reasonable doubt that Swanson was the person who intimidated the victims and robbed the bank.
Mr. Ochoa's abandonment of his duty of loyalty to his client by assisting the prosecutor also created a conflict of interest. In Osborn, the Tenth Circuit commented as follows:
A defense attorney who abandons his duty of loyalty to his client and effectively joins the state in an effort to attain a conviction or death sentence suffers from an obvious conflict of interest. Such an attorney, like unwanted counsel, "`represents' the defendant only through a tenuous and unacceptable legal fiction." Faretta v. California, 422 U.S. 806, 821, 95 S.Ct. 2525, 2534, 45 L.Ed.2d 562 (1975). In fact, an attorney who is burdened by a conflict between his client's interests and his own sympathies to the prosecution's position is considerably worse than an attorney with loyalty to other defendants, because the interests of the state and the defendant are necessarily in opposition.
861 F.2d at 629.
The Government has failed to identify any strategy that can justify Mr. Ochoa's betrayal of his client. "[E]ven when no theory of defense is available, if the decision to stand trial has been made, counsel must hold the prosecution to its heavy burden of proof beyond reasonable doubt." Cronic, 466 U.S. at 656-57 n. 19, 104 S.Ct. at 2045-46 n. 19. By arguing that no reasonable doubt existed regarding the only factual issues in dispute, Mr. Ochoa shouldered part of the Government's burden of persuasion.
We cannot envision a situation more damaging to an accused than to have his own attorney tell the jury that there is no reasonable doubt that his client was the person who committed the conduct that constituted the crime charged in the indictment.
943 F.2d at 1075 (emphasis added).
[6] In fact, the procedure advocated by the dissent here would be much worse and more prejudicial than the entry of a formal plea of guilty, because at least a formal plea would have foreclosed the State from presenting, during a trial on guilt, the extensive devastating evidence of guilt alluded to by the dissent. The kind of "guilty plea" allowed here to be entered by counsel alone gave the defendant the worst of all worlds: an admission of guilt plus the devastating evidence put on by the State during a guilt phase trial that was rendered unnecessary by counsel's guilty plea.
[7] This assault trial involved the same counsel and was conducted before the same judge who presided over his murder trial.
[8] United States v. Cronic, 466 U.S. 648, 654, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984).
[9] Boykin v. Alabama, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969).