857 So.2d 172 (2003)
Joe Elton NIXON, Appellant,
v.
STATE of Florida, Appellee.
Joe Elton Nixon, Petitioner,
v.
James V. Crosby, Jr., etc., Respondent.
Joe Elton Nixon, Appellant,
v.
State of Florida, Appellee.
Nos. SC92006, SC93192, SC01-2486.
Supreme Court of Florida.
July 10, 2003.
Rehearing Denied October 1, 2003.
*173 Jonathan Lang, Eric M. Freedman, New York, NY, and John J. Lavia, III of Landers & Parsons, Tallahassee, FL, for Appellant/Petitioner.
Charles J. Crist, Jr., Attorney General, and Curtis M. French, Senior Assistant Attorney General, Tallahassee, FL, for Appellee/Respondent.
PER CURIAM.
Joe Elton Nixon, a prisoner under a sentence of death, appeals an order of the trial court denying his motion for postconviction relief under Florida Rule of Criminal Procedure 3.850. Additionally, he files a petition for a writ of habeas corpus with this Court. We have jurisdiction. See art. V, § 3(b)(1),(9), Fla. Const. For the reasons that follow, we remand this case to the trial court for a new trial.

FACTS AND PROCEDURAL HISTORY
Joe Elton Nixon was charged, convicted, and sentenced to death for the 1984 murder of a Tallahassee woman. This Court affirmed the conviction and sentence on direct appeal. See Nixon v. State, 572 So.2d 1336 (Fla.1990).[1] The United States Supreme Court denied Nixon's petition for a writ of certiorari. See Nixon v. Florida, 502 U.S. 854, 112 S.Ct. 164, 116 L.Ed.2d 128 (1991). Subsequently, in 1993, Nixon filed a rule 3.850 motion, which the trial court denied without an evidentiary hearing. Nixon appealed the trial court's summary denial of his 3.850 motion to this Court. Additionally, Nixon filed a petition for a writ of habeas corpus with this Court. Nixon raised seven issues relating to the denial of his rule 3.850 motion[2] and three issues in his habeas petition.[3]See Nixon v. Singletary, 758 So.2d 618 (Fla.2000).[4]
In Nixon II, this Court found Nixon's claim that he was denied the effective assistance of counsel when his lawyer conceded guilt without his consent to be the primary issue in the case. Nixon's counsel made the following statement during opening argument of the guilt phase:

*174 In this case, there will be no question that Jeannie [sic] Bickner died a horrible, horrible death. Surely she did and that will be shown to you. In fact, that horrible tragedy will be proved to your satisfaction beyond any reasonable doubt. In this case, there won't be any question, none whatsoever, that my client, Joe Elton Nixon, caused Jeannie [sic] Bickner's death. Likewise, that fact will be proved to your satisfaction beyond any reasonable doubt. This case is about the death of Joe Elton Nixon and whether it should occur within the next few years by electrocution or maybe its natural expiration after a lifetime of confinement.
Nixon, 758 So.2d at 620.
During closing argument, Nixon's counsel made the following statement:
Ladies and gentlemen of the jury, I wish I could stand before you and argue that what happened wasn't caused by Mr. Nixon, but we all know better. For several very obvious and apparent reasons, you have been and will continue to be involved in a very uniquely tragic case. In just a little while Judge Hall will give you some verdict forms that have been prepared. He'll give you some instructions on how to deliberate this case. After you've gotten those forms and you've elected your foreperson and you've done what you must do, you will sign those forms. I know you are not going to take this duty lightly, and I know what you will decide will be unanimous. I think that what you will decide is that the State of Florida, Mr. Hankinson and Mr. Guarisco, through them, has proved its case against Joe Elton Nixon. I think you will find that the State has proved beyond a reasonable doubt each and every element of the crimes charged, first-degree premeditated murder, kidnapping, robbery, and arson.
Id.
On appeal, the parties were in disagreement regarding the appropriate standard of review to be applied in the case. The State argued that the standard explained in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), should be applied, whereas Nixon argued that because counsel's concessions amounted to per se ineffective assistance of counsel, the United States v. Cronic, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), standard was the proper test. Ultimately, this Court held that if Nixon could establish that he did not consent to counsel's strategy, then the Court would find counsel to be per se ineffective under the Cronic standard. This Court reasoned that the Cronic standard should apply because:
Although statements made by attorneys in closing arguments are not evidence, nevertheless, for all practical purposes, counsel's admission of guilt on behalf of his client denied to petitioner his constitutional right to have his guilt or innocence decided by the jury. Petitioner, in pleading not guilty, was entitled to have the issue of his guilt or innocence presented to the jury as an adversarial issue. Counsel's complete concession of petitioner's guilt nullified the adversarial quality of this fundamental issue.
Nixon, 758 So.2d at 623 (quoting Wiley v. Sowders, 647 F.2d 642, 650 (6th Cir.1981)). Since counsel's comments operated as the "functional equivalent of a guilty plea," this Court concluded that "Nixon's claim must prevail at the evidentiary hearing below if the testimony establishes that there was not an affirmative, explicit acceptance by Nixon of counsel's strategy. Silent acquiescence is not enough." Id. at 624. To *175 avoid similar problems in the future, this Court said:
[W]e hold that if a trial judge ever suspects that a similar strategy is being attempted by counsel for the defense, the judge should stop the proceedings and question the defendant on the record as to whether or not he or she consents to counsel's strategy. This will ensure that the defendant has in fact intelligently and voluntarily consented to counsel's strategy of conceding guilt.
Id. at 625 (citations omitted). Accordingly, we remanded the case to the trial court to hold an evidentiary hearing on the issue of whether Nixon consented to trial counsel's strategy.[5]
On remand, an evidentiary hearing was held before Judge Janet Ferris on May 11, 2001. Although Nixon was present at the evidentiary hearing, he did not testify; the only witness presented was Michael Corin, Nixon's trial counsel. After the hearing, the trial court denied relief and found that Nixon consented to counsel's strategy. This appeal followed.[6]

LAW AND ANALYSIS
The dispositive issue is whether Nixon is entitled to a new trial under this Court's decision in Nixon II. In reaching the merits of this issue, this Court must decide whether there is competent, substantial evidence to support the trial court's conclusion that Nixon consented to trial counsel's strategy of conceding guilt.[7] In Nixon II, this Court directed the trial court to conduct an evidentiary hearing to determine whether evidence existed which indicated an "affirmative, explicit acceptance by Nixon of counsel's strategy. Silent acquiescence is not enough." 758 So.2d at 624. Nixon never testified at the evidentiary hearing on this issue. On direct examination, trial counsel repeatedly testified that Nixon did nothing when asked his opinion regarding this trial strategy.
Q: [Nixon's Postconviction Counsel] Did you discuss the strategy of not contesting guilt with the defendant?
A: [Corin] I thought I answered it. But if I didn't answer it, then yes, he was advised as to that, yes.
Q: And how did he respond?
A: To the best of my knowledge, again he did nothing, except after it occurred that he was not real pleased. And I think I answered that before also.
Q: Now what do you mean by he did nothing?
A: He did nothing. I don't know. I don't know what else I can say, Mr. Evans. I have said it before.
Corin further testified that Nixon provided neither verbal nor nonverbal indication that he did or did not wish to pursue *176 counsel's strategy of conceding guilt.[8] Thus, at most, this testimony demonstrates silent acquiescence by Nixon to counsel's strategy.
The trial court indicated that it would consider the totality of the circumstances in making a determination of whether Nixon affirmatively and explicitly agreed to counsel's strategy of conceding guilt to the charged crime. The court in its written order noted that one of the factors that needed to be examined was the general pattern of Corin's interactions and communications with Nixon. After reviewing the trial record, Nixon I and Nixon II, the transcript of the evidentiary hearing conducted on December 19, 1988, and Corin's testimony at the May 11, 2001, evidentiary hearing, the trial court found that Nixon's pattern of interactions with counsel involved information being provided by Corin, followed by silence from Nixon. In essence, the trial court found that Nixon's failure to approve or disapprove verbally was approval of counsel's strategy.
In Nixon II, we found that counsel's comments at trial were the functional equivalent of a guilty plea. Since counsel's comments operated as a guilty plea, in order to affirm the trial court's ruling, the record must contain substantial evidence which would enable this Court to determine that Nixon did more than silently submit to counsel's strategy. There is no evidence that shows that Nixon affirmatively, explicitly agreed with counsel's strategy. The only evidence presented at the evidentiary hearing was Corin's testimony, which indicated that Nixon neither agreed nor disagreed with counsel's trial strategy. Thus, there is no competent, substantial evidence which establishes that Nixon affirmatively and explicitly agreed to counsel's strategy. Without a client's affirmative and explicit consent to a strategy of admitting guilt to the crime charged or a lesser included offense, counsel's duty is to "hold the State to its burden of proof by clearly articulating to the jury or fact-finder that the State must establish each element of the crime charged and that a conviction can only be based upon proof beyond a reasonable doubt." Nixon II, 758 So.2d at 625 (emphasis added). Since we held in Nixon II that silent acquiescence to counsel's strategy is not sufficient, we find that Nixon must be given a new trial.

CONCLUSION
Accordingly, for the reasons stated in this opinion and in our opinion in Nixon II, we reverse the trial court's denial of postconviction relief and remand for a new trial. In light of our disposition of Nixon's rule 3.850 appeal, Nixon's habeas corpus petition is dismissed as moot.
It is so ordered.
ANSTEAD, C.J., and PARIENTE, QUINCE, and CANTERO, JJ., concur.
ANSTEAD, C.J., concurs specially with an opinion, in which PARIENTE and QUINCE, JJ., concur.
LEWIS, J., concurs in result only with an opinion.
WELLS, J., dissents with an opinion, in which SHAW, Senior Justice, concurs.
*177 ANSTEAD, J., specially concurring.
I concur in the majority opinion because it simply reaffirms a fundamental principle long ago established by the United States Supreme Court and consistently adhered to by courts, that counsel cannot enter a plea of guilty to a criminal indictment without the express consent of the defendant. See Jones v. Barnes, 463 U.S. 745, 751, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983) ("[T]he accused has the ultimate authority to make certain fundamental decisions regarding the case, [such] as ... whether to plead guilty...."); Boykin v. Alabama, 395 U.S. 238, 242-44, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969) (recognizing that a defendant's decision to plead guilty involves the simultaneous waiver of several constitutional rights and, hence, waiver must be knowingly and voluntarily made by defendant); Brookhart v. Janis, 384 U.S. 1, 7-8, 86 S.Ct. 1245, 16 L.Ed.2d 314 (1966) (holding that attorney does not have the power to enter a plea of guilty or to admit guilt "in effect" where the defendant has not consented to such a strategy); Sistrunk v. Vaughn, 96 F.3d 666, 670 (3d Cir.1996) ("[C]ertain litigation decisions are considered `fundamental' and are for the client to make. These include decisions on whether to plead guilty, whether to testify, and whether to take an appeal."); Johnson v. Duckworth, 793 F.2d 898, 900 (7th Cir. 1986) ("[T]he decision to plead guilty is one that must be made by the defendant, and is not one in which an attorney may speak for his client without consultation."); Wiley v. Sowders, 647 F.2d 642, 650 (6th Cir.1981) ("Unquestionably, the constitutional right of a criminal defendant to plead `not guilty,' or perhaps more accurately not to plead guilty, entails the obligation of his attorney to structure the trial of the case around his client's plea."); Childers v. State, 782 So.2d 513, 517 (Fla. 1st DCA 2001) ("It is well established that an attorney may not concede guilt for any crimes to which the defendant has pled `not guilty' unless the court finds that the defendant understands the consequences of the concession, because it is the functional equivalent of a guilty plea."); Taylor v. State, 695 So.2d 1293, 1295 (Fla. 5th DCA 1997) ("While counsel may believe it tactically wise to stipulate to a particular element of a charge or to issues of proof, an attorney may not stipulate to facts which amount to the `functional equivalent' of a guilty plea without [the defendant's] consent.").
This fundamental principle is so firmly established that we have long ago incorporated it into an explicit and mandatory rule of criminal procedure. See Fla. R.Crim. P. 3.171(c)(1) ("Defense counsel shall not conclude any plea agreement on behalf of a defendant-client without the client's full and complete consent thereto, being certain that any decision to plead guilty or nolo contendere is made by the defendant."); see also Fed.R.Crim.P. 11 (requiring court to conduct inquiry of defendant wishing to plead guilty on the record to ensure defendant knows consequences of such plea); ABA Standards for Crim. Justice, Std. 4-5.2 (3d ed.1993) (stating that what pleas to enter and whether to accept a plea are ultimately decisions to be made by the accused after receiving full and careful advice from counsel).
Of course, this fundamental principle applies equally to the most heinous offenses as well as those of a less serious nature. Further, while the delay in the resolution of this case should be cause for concern, it is apparent that a significant portion of that delay has been caused by either the failure to apply this principle at the trial level, or out of concern that the State be given every opportunity to demonstrate that the defendant did agree to allow his counsel to admit his guilt to capital murder. We have explicitly denied the defendant *178 any privilege to prevent his counsel from testifying about the defendant's consent to counsel's admission of guilt to capital murder.
When we previously reviewed this case, Justice Harding wrote an opinion that continues to provide a compelling explanation for our adherence to this fundamental principle:
Prior to this nation's birth, the colonists were subjected to a system of government that denied individual rights and liberties and failed to provide due process. Based on their experience with the English monarchy and its courts, the founders of this country were determined to ensure that a number of individual rights and liberties were specifically provided for within the body of the Constitution. Today these rights include the right to have effective assistance of counsel in criminal matters, the right against self-incrimination, the right to an impartial jury, the right to a fair trial, the right to confront one's accusers, the right to be presumed innocent until proven guilty, and the right that the government prove a criminal matter beyond a reasonable doubt. These rights are available to all citizens, regardless of race, creed, or social status. History has shown that it is only when due process is strictly adhered to that judicial outcomes are credible. It has been said a number of times that it is more important that no innocent man be convicted than a guilty man go free. See In re Winship, 397 U.S. 358, 372, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) (Harlan, J., concurring) ("[I]t is far worse to convict an innocent man than to let a guilty man go free."); Furman v. Georgia, 408 U.S. 238, 367 n. 158, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (Marshall, J., concurring) ("[I]t is better for ten guilty people to be set free than for one innocent man to be unjustly imprisoned.") (quoting William O. Douglas, Foreword to Jerome Frank & Barbara Frank, Not Guilty 11-12 (1957)).
I share and understand the frustration of my colleagues in dissent. This is a difficult case for several reasons, not the least of which is the substantial evidence of the defendant's guilt. I do not question the competence or experience of trial counsel. Neither do I underestimate the frustration counsel must have experienced with such a disruptive and uncooperative client. Nor do I question that the strategy taken by defense counsel was an effective one reasonably calculated to help the defendant avoid the death penalty. Yet, I cannot accept that substantial evidence of guilt, a disruptive client, and an effective trial strategy can preempt the constitutional right of a defendant to the presumption of innocence and the requirement that a guilty plea be knowingly and intelligently entered. A plea of guilty cannot be entered to a judge or a jury without the defendant's consent. It is not a theoretical gloss or a hypothetical exercise to require that a defendant, no matter how gruesome or horrible his crime, how guilty he is, or how good the trial strategy, be accorded those rights. The courts have consistently required a judge to make inquiry and determine that a guilty plea is voluntarily, intelligently, and freely entered. We have developed a detailed rule setting forth specific procedures that courts must follow in making this determination. See Fla. R.Crim. P. 3.172. My research has not revealed a case where the failure to ensure that a defendant's plea of guilty was voluntary and intelligently entered was error subject to a harmless error analysis.
In the absence of certain knowledge of whether Nixon consented to counsel's strategy, the process for determining *179 guilt or innocence was utterly flawed in this case. If Nixon did not consent, then a number of his constitutional rights were violated: he did not have a fair trial, he did not have effective representation, he was not seen as innocent until proven guilty, and the government was not held to its burden of establishing its case beyond a reasonable doubt. Despite his difficult behavior, Nixon was still entitled to his constitutional rights. Without the benefit of these rights, we can place no credence in the jury's verdict of guilt in this case. Any other conclusion would rend the very fabric from which our justice system was woven.
Nixon v. Singletary, 758 So.2d 618, 625-26 (Fla.2000) (Harding, C.J., concurring).
PARIENTE and QUINCE, JJ., concur.
LEWIS, J., concurring in result only.
I concur in result only because I am compelled to do so solely and exclusively by the doctrine of law of the case. Although the decision and result here are, in my view, both legally and logically incorrect, the "roadmap to reversal" was previously drawn, and the misdirection of the correct applicable legal concepts written in Nixon v. Singletary, 758 So.2d 618 (Fla. 2000), which has become commonly referred to as Nixon II with which I dissented at the time. As unfortunate and convoluted as these legal and factual circumstances may be, I am bound by the prior decision of this Court and will honor its precedent.
In concurring in result only, I do not suggest that this Court has applied the appropriate standards or delivered the correct principles of law in connection with cases involving defendants who have intentionally disrupted the legal process and legal proceedings for their own advantage as has occurred here. I believe the record clearly demonstrates that the defendant here intentionally disrupted his original trial proceedings, effectively blocked a proper and full truth-finding determination of the effective assistance of counsel issue when initially presented to this Court, and has now secured judicial benefits flowing from his disruptive tactics related to the legal proceedings conducted following the death of the victim in 1984. Almost twenty years after the event, this Court is rewarding an intentionally disruptive defendant and misdirecting a fair and just determination of the issues that should be properly before the court.
I suggest that this Court became misdirected when it held that the present case involved ineffective assistance of counsel per se under the decision of the United States Supreme Court in United States v. Cronic, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), when this Court considered the issue in Nixon II. In my view, this Court had previously considered and rejected such position ten years earlier in 1990 in Nixon v. State, 572 So.2d 1336 (Fla.1990), when this Court unanimously affirmed Nixon's convictions and sentences. As I read the record in this Court, Nixon asserted on appeal to this Court prior to 1990 that per se ineffective assistance of counsel under Cronic had occurred during the trial proceedings. At that time, this Court remanded the case to the trial court simply for an evidentiary hearing to determine whether Nixon had been informed of the strategy to concede the factual predicate for the case and to center the case upon seeking leniency and preserving the life of the defendant. When the case was remanded at that time, the trial court found and determined:
1. Trial Defense Counsel Corin reviewed with capital Defendant/Appellant Nixon, the defense approach to the case in general terms including, but not limited *180 to, the probability that he would concede the killing of the victim by Nixon.
2. Corin and Nixon had previous attorney-client relationships, both were veterans of the criminal justice system and although Nixon manifested no reaction, he understood what was to take place.

3. Nixon made no objection and did not protest the strategy and tactic employed at trial.

Based on the foregoing, this Court concludes that the Defendant/Appellant Nixon has not sustained his burden of proof by the applicable standard that he (a) was neither informed nor knew of the trial strategy and tactic employed by Defense Trial Counsel Corin nor (b) did not consent thereto or (c) acquiesce therein.
State v. Nixon, No. 84-2324-CF, order at 10 (Fla.2d Cir. Ct. order filed Oct. 3, 1989).
The foregoing findings by the trial judge were entered as the case had been remanded to the trial court for specific findings on the issue. The trial court's order and findings were abundantly clear that Nixon never sustained his burden in connection with the claims of ineffective assistance of counsel based upon allegations that he was neither informed, nor knew of the trial strategy, nor did Nixon carry his burden to demonstrate that he had not consented to the trial strategy employed by his defense counsel. The findings entered before our 1990 opinion are important in consideration of the flow of the present case because in our earlier 1990 opinion, we specifically stated:
However, the state's examination of Mr. Corin [defense counsel] was extremely limited due to his refusal to testify concerning matters not already addressed during his testimony for the defense absent Nixon's waiver of the attorney-client privilege. Nixon refused to waive the privilege and the State was unable to fully examine Mr. Corin.
We recognize the confusion resulting from our remand for these atypical proceedings and decline to dispose of this claim on the present state of the record which we view as less than complete. Accordingly, we do so without prejudice to raise the issue in a later motion to vacate pursuant to Florida Rule of Criminal Procedure 3.850.
Nixon v. State, 572 So.2d at 1340. It is clear that this Court was concerned at that time that it was not permitted to have access to the full information because Nixon had refused to waive the attorney-client privilege. The Court at that time noted that the record was incomplete due to Nixon's failure to waive the attorney-client privilege.
In my view, this Court in 1990 considered and rejected application of United States v. Cronic and rejected the view that under these circumstances per se ineffective assistance of counsel arose. If Cronic were applicable when presented to this Court in 1990, it would have been unnecessary to conduct further proceedings regarding the interaction between Nixon and his counsel. I suggest that the Court in 1990 understood the record before it and concluded that the record did not establish per se ineffective assistance of counsel as the applicable standard. There would have been no need for further activity had that been the conclusion of this Court at that time. In my view, this Court only permitted Nixon an opportunity to present the issue again in a collateral motion to afford an opportunity to Nixon to establish by additional evidence the elements required by Strickland. When the postconviction collateral motion was filed by Nixon and considered initially, Nixon chose not to present sufficient evidence to afford relief under Strickland, and, in fact, precluded *181 full examination of the issue with regard to counsel's performance by refusing to permit his counsel to testify concerning their conversations. In essence, in the collateral proceeding, this Court in Nixon v. Singletary, 758 So.2d 618 (Fla.2000), permitted Nixon to assert the issue of ineffective assistance of counsel and then assert an attorney-client privilege by remanding for consideration of the issue under the standard established in Cronic rather than applying the requirements of Strickland.
My view of the record indicates that Nixon confessed to law enforcement and to members of his family with regard to the facts surrounding the murder of the victim in this case. The evidence indicated that Nixon was competent to participate in the trial proceeding, that he was malingering, and that he was attempting to disrupt the orderly process of the trial court proceedings. Under these circumstances, the majority of this Court in Nixon II, in my view, precluded trial counsel from attempting to save the life of a defendant through a trial strategy that would accept the existence of the overwhelming factual evidence and attempt to center upon preserving the life of the defendant. This Court announced the requirement in Nixon II that before this type of trial strategy or trial tactic may be utilized, the attorney must either first obtain express approval of the trial court after presenting all of the negative factual information to a trial judge who is the final adjudicator as to whether a death penalty will be imposed or obtain the express acceptance of a particular trial strategy by a disruptive defendant who has no intention of ever cooperating so that a trial proceeding could move forward. In my view, this Court reached an impractical result in Nixon II, and such result and the standards expressed therein rendered the proceedings which we now review as perfunctory steps in the process.
My review of this record demonstrates an especially aggravated circumstance where the victim had been kidnaped in her own motor vehicle from a local shopping mall, the victim had been tied between trees with motor vehicle jumper cables and the victim was actually burned alive. Here, Nixon confessed not only to law enforcement in substantial detail, but he also confessed to members of his immediate family who testified about those very confessions during the trial. Three well-respected trial judges have now examined the issue of trial counsel's effectiveness and the trial strategy utilized, and have made it clear that this defense attorney was approaching this case in the only available and reasonable defense posture possible in attempting to save Mr. Nixon from the death penalty under the facts presented in this case.
In the initial postconviction collateral proceeding, the trial judge entered an exhaustive order detailing the conduct of this capable defense counsel and the very significant actions, including the introduction of some fifty exhibits in support of mitigation and the presentation of at least nine witnesses to provide mitigation evidence directed to the defendant's background, and mental and emotional problems. The trial judges have continuously noted that throughout this litigation, defense counsel has consistently emphasized the strategic theme and trial tactic that focused upon Nixon's mental and emotional problems and that defense counsel was simply presenting the very best argument and approach to secure a life sentence with the admitted aggravated factors that were presented before the jury.
When the case was before this Court in 2000, the trial judge during the initial postconviction proceeding had expressly addressed and rejected the argument that these circumstances must be controlled by *182 United States v. Cronic, and the trial judge at that time expressly stated:
(3) In the alternative, Defendant argues that counsel's concession of guilt without an express waiver by Defendant on the record constitutes ineffective assistance of counsel per se under United States v. Cronic, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). Defendant claims that Cronic obviates the necessity of demonstrating prejudice, which is normally required for an ineffective assistance of counsel claim.
In Cronic, the United States Supreme Court held that when surrounding circumstances justify a presumption of ineffectiveness, a Sixth Amendment claim can be sufficient without inquiring into counsel's performance. Such circumstances arise when a Defendant is denied presence of counsel at a critical stage in the prosecution or when there is a breakdown in the adversarial process that would justify a presumption that a Defendant's conviction was reliable. Id. at 2046-2049. Cronic applies to a narrow spectrum of cases where counsel's ineffectiveness was so egregious that the Defendant was in effect denied any meaningful assistance at all. See also, Chadwick v. Green, 740 F.2d 897 (11th Cir.1984). Apart from circumstances of that magnitude, there is generally no basis for finding a Sixth Amendment violation unless the accused can show how specific errors of counsel undermine the reliability of the finding of guilt. Cronic, supra, at 2047 (citing Strickland v. Washington, 466 U.S. at 693-696, 104 S.Ct. At 2067-2069).
As evidenced by the court record cited in the above paragraphs, this case is not one in which the surrounding circumstances justify a presumption of ineffectiveness. There is no allegation that Defendant was denied assistance of counsel in his defense. Cronic, supra at 2044. Neither the deficiency alleged, nor the record of the trial reveal a breakdown in the adversarial process that would justify a presumption that Defendant's conviction was not sufficiently reliable to satisfy the Constitution. Cronic, supra at 2049. Because defense counsel's concession of guilt, to try to retain sympathy during the penalty phase, is an acceptable defense strategy, Defendant is required to show prejudice. This reasoning is consistent with other courts that have applied the Strickland standard for ineffective assistance of counsel claims, which requires prejudice to similar defense strategies. See Magill v. Dugger, 824 F.2d 879 (11th Cir.1987). Defense counsel's concession of guilt did not, and could not possibly have prejudiced Defendant in any way. The evidence of guilt was so overwhelming the jury would have found him guilty as charged even without concession. For the same reasons discussed under the Strickland claims, Defendant fails to show that but for counsel's errors the result of the proceeding would have been different.
When this Court in 2000 rejected this reasoning, it failed to accommodate the severe and aggravated factors with which the trial court was faced. The defendant here would not attend trial court proceedings, the defendant had removed his clothing in a holding cell, and the defendant had demanded that a different judge conduct the proceedings and that he be assigned different counsel. I suggest that the record in these proceedings prior to this Court's decision in 2000 reflects that Nixon had continually attempted to disrupt the proceedings in this case. When this Court rendered its decision in 2000 in Nixon II, it demonstrated that Nixon had succeeded in his attempt and that decision was predicated *183 upon all facts which were available to be considered.
In my view, experienced defense counsel, who was doing the very best under the most difficult of circumstances, attempted to save the life of this defendant. The circumstances in this case involved very heinous and aggravated circumstances and the violent and aggravated circumstances were admitted by the defendant to not only law enforcement personnel but also to members of his family who all testified in detail concerning those confessions. Here, the circumstances, trial strategy, and trial tactics of experienced defense counsel have now been recognized by multiple trial judges as the clearly appropriate and essentially the only defense strategy available under these aggravated facts. This record demonstrates that experienced defense counsel was conscientious and worked diligently in the best interests of his client as he attempted to preserve his life. In my opinion, it is clear that everyone, including Nixon, was aware of the trial strategy but the burden placed upon the proceedings by this Court in Nixon II rendered the present outcome the only possible outcome under the law and standards as stated.
I am extremely concerned that the history in this case may be improperly utilized by individuals in the future and that due to the nature of the restrictions this Court has now placed upon defense counsel, the defense of death penalty defendants will not be performed in the most effective manner possible. I suggest that cases such as this place trial lawyers in the most difficult of situations. When an individual confesses not only to law enforcement but also to members of his or her immediate family with regard to very aggravated and heinous crimes and this Court will not permit a trial attorney to even acknowledge that which has been confessed as true but forces the attorney to engage in full litigation as though the confessions never occurred, lawyers and the judicial system are placed in a precarious position and citizens are legitimately caused to question the veracity of lawyers and judicial proceedings. If I were writing on a clean slate, I would affirm the decision of the trial court here but, unfortunately, Nixon II directs a different result and I am therefore compelled to concur in the result based solely upon the law of the case.
WELLS, J., dissenting.
I dissent because I conclude that this Court's granting to defendant Nixon a new trial is legally wrong and not justified or demonstrated to be required by the majority opinion.
It has now been almost nineteen years since Ms. Bickner was abducted from the Governor's Square Mall in Tallahassee and murdered. This same issue upon which a new trial is now granted by the majority has been framed in this record since Judge Hall made his statement at the close of the trial proceedings in 1985. Clearly, this same issue was in the record when this Court affirmed Nixon's conviction and sentence of death in 1990.
Then, in 2000, if this Court was going to grant a new trial on this issue, the question was expressly before this Court. I wrote at that time:
I also dissent because I believe the majority's opinion, after more than nine years, creates a new standard for this case. The majority opinion states at page 624: "[W]e conclude that Nixon's claim must prevail at the evidentiary hearing below if the testimony establishes that there was not an affirmative, explicit acceptance by Nixon of counsel's strategy. Silent acquiescence is not enough." Is this to be "established" by *184 a preponderance of the evidence-clear and convincing evidence-or to the exclusion of every reasonable doubt? Is a nod of the head sufficient, or does the majority actually require a [Boykin v. Alabama, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969)] on-the-record acceptance to have been made? It appears to me that the majority is here dictating a new trial, only leaving to the trial judge the actual ordering of it.
This appears to me to dictate a new trial because the record has been clear for the fifteen years since this trial that during the trial Nixon set about not to "explicitly accept" anything. This was part and parcel of his disruptive and noncooperative conduct. If "explicit acceptance" per Boykin is the requirement, this Court should have so stated in 1990. If that had been correctly the issue then, this Court's majority at that time would have reversed for a new trial based on the record, which does not have a Boykin on-the-record "explicit acceptance." However, the then unanimous majority did not do that. The present new majority confuses our procedure when it in actuality rehears and sets aside that decision. I conclude that it is harmful to the processing of capital cases generally when the majority of this Court erodes the distinction between direct appeal and postconviction relief for a particular case, as is being done here.
Nixon v. Singletary, 758 So.2d 618, 634 (Fla.2000) (Wells, J., dissenting). But this Court did not order a new trial but remanded this case for an evidentiary hearing in the circuit court.
Upon that remand, Judge Janet Ferris held the hearing ordered by this Court's majority. Judge Ferris thereafter, in an exceptionally thorough and thoughtful order, came to the conclusion that the postconviction motion should be denied. In pertinent part, Judge Ferris's order states:
Issues now before this court for resolution involve legal challenges initially raised in Defendant Joe Elton Nixon's direct appeal from his conviction and sentence of death for the murder of Jeanne Bickner. Ms. Bickner was murdered on August 12, 1984. Joe Elton Nixon's trial for that murder took place in July of 1985, and his conviction was appealed to the Florida Supreme Court. In the direct appeal, the Court was asked to address Mr. Nixon's claim that he was denied effective assistance of counsel at the guilt phase of his trial when his attorney, Assistant Public Defender Michael Corin, conceded guilt and sought leniency regarding Mr. Nixon's punishment. To fully explore that issue, the Florida Supreme Court temporarily relinquished jurisdiction to the trial court in October of 1987 to "determine whether Nixon was informed of the strategy to concede guilt and seek leniency." Nixon v. State, 572 So.2d 1336, 1339 (Fla.1990).
Due to some confusion about the procedure to be followed at the evidentiary hearing, a second order was issued by the Supreme Court on October 4, 1988, to outline which witnesses would be permitted to testify and limitations on their cross-examination. Continuing confusion about the scope of the hearing and the trial court's responsibilities at that hearing resulted in another clarifying order on February 1, 1989. At the August 30, 1989, hearing that finally attempted to resolve the ineffective assistance issue, Mr. Nixon declined to waive the attorney-client privilege, which effectively precluded Mr. Corin from discussing his communications with Mr. Nixon. The Supreme Court found the *185 record of those proceedings "less than complete," and ultimately declined to dispose of the claim, inviting the defendant to revisit the matter in a post-conviction motion brought pursuant to Florida Rule of Criminal Procedure 3.850. Nixon, at 1339-1340.
Mr. Nixon filed his 3.850 motion on October 7, 1993. In 1997, the trial court denied the motion without an evidentiary hearing. Included in that order was the summary denial of several claims asserting that Mr. Nixon's trial counsel was ineffective, including the specific claim that Mr. Corin's concession of guilt without an express waiver by Defendant on the record constituted per se ineffective assistance of counsel under United States v. Cronic, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). The trial court disposed of Mr. Nixon's Cronic claim by finding that "... this case is not one in which the surrounding circumstances justify a presumption of ineffectiveness.... Neither the deficiency alleged, nor the record of the trial reveal a breakdown in the adversarial process that would justify a presumption that Defendant's conviction was not sufficiently reliable to satisfy the Constitution (citation omitted)." That order was appealed to the Florida Supreme Court, resulting in Nixon v. Singletary, 758 So.2d 618 (Fla.2000), the decision which has again remanded Mr. Nixon's case to the trial court for a limited evidentiary hearing.
In Nixon v. Singletary, the Supreme Court considered both the trial court's summary denial of Mr. Nixon's 3.850 post-conviction motion and his petition for writ of habeas corpus. In deciding to remand the case to the circuit court for an evidentiary hearing, the Court concluded that the "... resolution of one issue ... [is] dispositive in this case: whether Nixon's trial counsel was ineffective during the guilt phase of the trial." Nixon v. Singletary at 620. Although numerous ineffectiveness claims were raised in Mr. Nixon's 3.850 motion, the Court's decision focused on Nixon's charge that his attorney's concession of guilt in opening statement was "... the equivalent of a guilty plea by his attorney." Nixon v. Singletary at 620. Mr. Nixon's further claim that he did not give his attorney consent to enter a guilty plea and did not consent to a trial strategy in which guilt would be admitted was a compelling issue for the Court. In a lengthy opinion, the Court concluded that Mr. Corin's statements to the jury were the "functional equivalent of a guilty plea." Nixon v. Singletary at 624.
Reasoning further that due process requires "... a court accepting a guilty plea to carefully inquire into the defendant's understanding of the plea so that the record contains an affirmative showing that the plea was intelligent and voluntary ...," the Court indicated that Mr. Nixon's "consent to his trial counsel to concede guilt" would apparently substitute for the lack of an inquiry and finding by the trial court that the "plea" was intelligent and voluntary. As further direction to this court regarding the evidentiary hearing, the Supreme Court observed that "... Nixon's claim must prevail at the evidentiary hearing below if the testimony established that there was not an affirmative, explicit acceptance by Nixon of counsel's strategy. Silent acquiescence is not enough." Nixon v. Singletary at 624. The Supreme Court found that the need for affirmative, explicit acceptance of this trial strategy emanates from the principle that "... the defendant, not the attorney, is the captain of the ship.... Although the attorney can make some *186 tactical decisions, the ultimate choice as to which direction to sail is left up to the defendant. The question is not whether the route taken was correct; rather the question is whether Nixon approved the course." Nixon v. Singletary at 625.
The Supreme Court's remand appears limited to one issue: did Joe Elton Nixon give his attorney, Mike Corin, consent to concede guilt at trial, and was that consent supported or evidenced by an "affirmative, explicit acceptance by Nixon" of this specific aspect of the trial strategy? One might suspect that such a question could be answered quickly and easily following a brief hearing. Unfortunately, that is not the case. Not only has there been disagreement about the status of Mr. Nixon's other post-conviction claims, but there is continuing dispute about the appropriate legal standard to be employed in resolving claims such as this. The State has forcefully argued that the Florida Supreme Court's understanding of United States v. Cronic, supra, is flawed, and that recent federal court decisions interpreting Cronic have explicitly rejected the Supreme Court's analysis of the issue. The State argues here, as it has recently in the United States Supreme Court, that the Florida Supreme Court's interpretation of Cronic is "overly expansive" and is contrary to the holding of the seminal post-conviction case of Strickland v. Washington, supra. Although compelling arguments, this court cannot agree that it is at liberty to revisit the legal basis for the remand in Nixon v. Singletary, supra. Other opportunities exist for the State to present its argument for resolution by the Florida Supreme Court and the United States Supreme Court.
It is obvious, however, that the Florida Supreme Court's opinion presents this court with a dilemma. Ordinarily, those matters deemed inappropriate for summary resolution of 3.850 post-conviction claims are returned to the trial court intact for an evidentiary hearing, and the resolution of the motion is based on application of the law to the facts determined at the hearing. In Nixon v. Singletary, the Supreme Court not only resolved the legal issues, but also circumscribed the type of evidence and the manner in which it could be considered by the trial court in addressing Mr. Nixon's claim. The most obvious concern faced by this court is how to balance the Supreme Court's direction to not only determine whether Mr. Nixon gave his consent to Mr. Corin's strategy of concession of guilt, but to do so only in the context of an "affirmative, explicit acceptance by Nixon" of that strategy. Ordinarily, the trial court may consider many factors in resolving issues of knowing and voluntary waivers of rights, and this case should be no exception. The court must also note that the burden of advancing his claim rests with Mr. Nixon, not the State, but the language of Nixon v. Singletary, suggests a shifting of that burden. The court can only conclude that such a shift was not intended, and that the burden of proof still rests with Mr. Nixon to show that he did not consent to the strategy affirmatively and explicitly.
At the evidentiary hearing held on May 11, 2001, Mr. Nixon did not testify, although he was present in the courtroom. Instead, counsel for Mr. Nixon called Mr. Corin to the witness stand, presumably to show that Mr. Nixon did not consent. Mr. Corin was candid and forthright in his testimony, and struggled to recall the details of an attorney-client relationship that was forged seventeen years ago. The details of that relationship are complicated by Mr. Nixon *187 himself, a rather intractable client charged with an especially horrible and notorious crime. The record of the guilt and penalty phases of his trial demonstrate that Mr. Nixon had mental health problems dating back to a very young age. Mental health professionals who examined Mr. Nixon prior to trial specifically noted that although Mr. Nixon was competent to stand trial and "technically" capable of cooperating with his attorney, "... his lifelong history of lying and creating fantasy situations and blaming others for his troubles ... [will make it] extremely difficult to get his full cooperation...."
That difficulty was evident at trial when Mr. Nixon removed his clothing in the holding cell during jury selection in an express demonstration of his refusal to attend the trial; he had previously refused to attend pretrial motions on July 8 and 9, 1985, forcing Mr. Corin to waive his presence at those hearings. Nixon v. State, at 1341. Without much elaboration, he insisted on being returned to the jail, wanted a new attorney, demanded a black judge, and threatened to disrupt the trial if he was forced into the courtroom. Nixon v. State, at 1341. During his conversation with Judge Hall in the holding cell, Mr. Nixon rarely answered the question posed to him, and at one point flatly refused to answer any more questions. The colloquy between Mr. Nixon and Judge Hall shows that Mr. Nixon was generally unresponsive to Judge Hall's patient inquiries, and consciously evaded answering the judge's questions regarding his refusal to enter the courtroom. The Supreme Court accepted Judge Hall's finding that Mr. Nixon's extraordinary behavior constituted a knowing, intelligent, and voluntary waiver of his attendance at the trial. That waiver, however, was based on the judge's finding that if Mr. Nixon failed to return to the courtroom after the recess, he would be consenting to proceeding without him. Id.

This court concurs in Judge Hall's conclusion that Mr. Nixon knowingly, intelligently, and voluntarily waived his attendance at the trial. However, it must be noted that the record does not reflect what would ordinarily be considered an affirmative, explicit waiver by Mr. Nixon of his right to be present at trial; instead, Judge Hall made his decision based on the circumstances as they existed at the time, Mr. Nixon's unusual behavior, and his exasperating conversation with Mr. Nixon. It is therefore obvious that the decision regarding whether Mr. Nixon consented to Mr. Corin's trial strategy can be made only after careful consideration of similar factors.
One of those factors must be the general patterns of Mr. Corin's interactions and communications with Mr. Nixon. By 1984, when he undertook representation of Mr. Nixon in this case, Mr. Corin was an experienced criminal trial attorney, and had also handled capital criminal appeals as an Assistant Attorney General and an Assistant Public Defender. Mr. Corin's experience with capital cases included attending and lecturing at a course designed exclusively for attorneys involved in capital cases. It is also of some note that Mr. Corin had represented Mr. Nixon in at least one other felony case prior to him being charged with first degree murder. The record clearly reflects that Mr. Corin conscientiously prepared the case for trial, and met numerous times with Mr. Nixon to discuss various trial strategies, the defenses that might apply in the case, and witnesses.

*188 Mr. Corin indicated that his relationship with Mr. Nixon was generally positive, and that they got along "fine." Despite an apparent lack of rancor or hostility in their attorney-client relationship, Mr. Corin noted that Mr. Nixon was not especially communicative, and often did not respond at all in discussions about the case. Testimony from Mr. Corin about Mr. Nixon's reaction to discussions about trial strategy, and in particular about conceding guilt, was especially compelling; Mr. Corin observed that although he discussed these matters with Mr. Nixon on several occasions, Mr. Nixon "did nothing." More importantly, Mr. Corin stated unequivocally that he would not have pursued the strategy of conceding guilt if Mr. Nixon had objected. The only conclusion that can be reached from this uncontroverted testimony is that the pattern of interactions in the attorney-client relationship between Mr. Corin and Mr. Nixon often involved information being provided by Mr. Corin, followed by silence from Mr. Nixon. Whether that pattern of interaction was constructive or helpful is not the issue; rather, Mr. Corin appears to have done all he could to carefully prepare the case for trial, consider the viability of various defenses, inform Mr. Nixon of what was happening with his case, and finally, tell his client what strategies he intended to pursue. It makes little sense to assume that a lawyer would encourage or prefer such stony silence from his or her client; there can be no doubt that active participation by the client in their defense is far more productive. It is also clear that when a client is a highly educated, intelligent, and articulate individual with no mental health problems, the patterns of communication between lawyer and client will be quite different from what usually transpired between Mr. Corin and Mr. Nixon. Mr. Corin did the best he could with a difficult case and a difficult client.
In resolving post-conviction claims, defendants urge trial courts to revisit each and every decision made by an attorney before, during and after a trial. Increasing numbers of motions to withdraw pleas are filed, and post-conviction motions asserting misadvice of counsel leading up to entry of a plea have flooded the trial courts. At their core are various assumptions about a criminal defendant's "right" to perfection in his or her representation. As the State noted in its Memorandum, everyone involved in the court process must possess a "... true understanding of the realities of representing criminal defendants." Mr. Corin perhaps stated the obvious when he testified that representing criminal defendants is a "pretty tough job" because some clients are helpful and others are not. He patiently pointed out that as a defense attorney "... you hope that you have clients that are cooperative"; when clients are not, "you do the best you can ... [and] represent them to the best of your ability." In response to a question from Assistant State Attorney Eddie Evans, Mr. Corin responded as follows: "But you've never been a criminal defense lawyer. So you don't really understand exactly how it is when you represent human beings in cases. And it is just not black and white, cut and dry. There are many times lawyers make decisions because they have to make them because the client does nothing." Mr. Corin's response was: "Yes, sir."
Mr. Corin's statements are compelling. The record of Mr. Nixon's trial provides ample evidence of what Mr. Corin faced in his interactions and communications with Mr. Nixon. It is hard to imagine a more onerous situation than a client charged with first degree murder absenting himself from the trial;

*189 here, in addition to a confession and overwhelming evidence, Mr. Corin had to contend with the prejudice Mr. Nixon would surely create by not being present in the courtroom during the trial. Did Mr. Nixon discuss with Mr. Corin his decision to take off his clothing and refuse to enter the courtroom? Should there have been an inquiry about whether this was Mr. Nixon's execution of an agreed-upon trial strategy, and whether he consulted with his attorney about it? It is evident that Mr. Nixon made his position known through bizarre behavior and angry statements, and not by an affirmative or explicit discussion of his decision with trial counsel or the court. It is likewise impossible to resolve the Supreme Court's question by reliance on an unrealistic construct. Mr. Corin's conduct as an attorney in this case must be evaluated by the objective standards described in the case law articulated by the United States Supreme Court, the Florida Supreme Court, and our District Courts of Appeal. That objective standard also must be applied to the facts and circumstances of this case, without resort to unfair presumptions about what should have occurred.
Relying on the trial record, the two reported decisions of the Florida Supreme Court addressing Mr. Nixon's case, and the evidentiary hearings conducted on December 19, 1988 and May 11, 2001, this court finds that Mr. Nixon did consent to the trial strategy of conceding guilt. His consent occurred as a part of his natural pattern of communication with Mr. Corin, wherein Mr. Corin would discuss these matters with Mr. Nixon, and Mr. Nixon would refuse to respond. The court further finds that the fact that Mr. Nixon did not provide counsel with an affirmative, explicit consent in words, and in the manner that we ordinarily expect and presume is acceptable, does not mean that it was not given. Looking to Mr. Nixon's manner of communicating with counsel and with the court during his jury trial alone, it is obvious that Mr. Nixon is often more comfortable communicating through his behavior, rather than the spoken word. The lack of words cannot, and did not, render his communication any less clear or explicit. Were we now to craft a legal standard requiring articulation for every knowing and voluntary waiver of rights, where other evidence exists to support the conclusion that a knowing and voluntary waiver occurred, we will create a standard that is impossible to meet. We may also encourage the creation of situations that will be impossible to resolve: if, after jeopardy attaches in a jury trial, the defendant merely refuses to answer a judge's questions about his or her presence at the trial, agreement with trial strategies such as conceding guilt on some charges but not others, or testifying at trial, what is the appropriate resolution of such an obvious stalemate? Trial courts must be given the opportunity to resolve such matters based upon the facts, rather than the existence or non-existence of certain words. In the case at bar, Mr. Nixon's actions speak clearly. We cannot now search for words that he was clearly disinclined to provide.
State v. Nixon, No. R84-2324AF, order at 1-14 (Fla.2d Cir. Ct. order filed Sept. 20, 2001) (record references omitted). Judge Ferris did what this Court's majority ordered. She held an evidentiary hearing and reached a factual conclusion. Now this Court rejects Judge Ferris's conclusion and grants a new trial. I agree with Judge Ferris.
SHAW, Senior Justice, concurs.
NOTES
[1] Hereinafter referred to as Nixon I.
[2] The issues raised in Nixon's appeal of the denial of his 3.850 motion were: (1) whether the circuit court denied him a full and fair hearing on his ineffective assistance of counsel claim; (2) whether he was denied his right not to be tried while mentally incompetent; (3) whether his death sentence had to be set aside because his counsel failed to make an effective argument for sparing his life and presented evidence that was harmful to his case during the sentencing phase of the trial; (4) whether he was denied a competent mental health evaluation in violation of Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985); (5) whether he was entitled to prove his claims under Johnson v. Mississippi, 486 U.S. 578, 108 S.Ct. 1981, 100 L.Ed.2d 575 (1988), that the two prior convictions used as aggravating circumstances lacked validity; (6) whether he should have the opportunity to prove that race discrimination tainted his conviction and death sentence; and (7) whether the jury weighed invalid and unconstitutionally vague aggravating circumstances in violation of James v. State, 615 So.2d 668 (Fla. 1993), and Jackson v. State, 648 So.2d 85 (Fla. 1994).
[3] In his habeas petition Nixon argued that: (1) appellate counsel failed to raise on direct appeal any issue regarding Nixon's competency to stand trial; (2) appellate counsel failed to properly preserve Nixon's claims under Ake v. Oklahoma; and (3) appellate counsel failed to properly preserve Nixon's claims under James v. State and Jackson v. State.
[4] Hereinafter referred to as Nixon II.
[5] This Court declined to address the remaining issues in Nixon's 3.850 appeal. Additionally, this Court opted not to address Nixon's habeas claims given its disposition of his 3.850 appeal.
[6] This appeal includes not only the Strickland/Cronic issue but also the seven issues not addressed in Nixon II. Because we grant relief on the ineffective assistance of counsel claim, we do not address the other issues or the claims raised in the habeas petition.
[7] Generally, our standard of review following a denial of a 3.850 claim after holding an evidentiary hearing affords deference to the trial court's factual findings." As long as the trial court's findings are supported by competent substantial evidence, this Court will not `substitute its judgment for that of the trial court on questions of fact, likewise of the credibility of the witnesses as well as the weight to be given to the evidence by the trial court.'" McLin v. State, 827 So.2d 948, 954 n. 4 (Fla.2002) (quoting Blanco v. State, 702 So.2d 1250, 1252 (Fla.1997)).
[8] Corin's testimony essentially mirrored his testimony given at the December 19, 1988, evidentiary hearing, at which Nixon invoked the attorney-client privilege. Thus, both the direct and cross-examination of Corin were extremely limited. Nonetheless, at that hearing Corin testified that Nixon did not affirmatively agree to his concession of guilt. Corin also testified that Nixon did not do or say anything to demonstrate his approval of the trial strategy.